UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

CRIMINAL NO. 04-65-DCR
CIVIL NO. 07-251-DCR

UNITED STATES OF AMERICA                                        PLAINTIFF


VS:                              RECOMMENDED DISPOSITION


TIMOTHY B. HARDING                                            DEFENDANT

*  *  *  *  *

The United States has submitted a motion to dismiss Defendant Timothy B. Harding's *pro se* § 2255 application.  *See* DE #183.  Harding previously pled guilty to one count alleging conspiracy to manufacture 50+ grams of methamphetamine and received a 324 month sentence.  *See* DE #135 (hereinafter "Judgment").  Harding appealed, but the Sixth Circuit dismissed the action based on a waiver provision in Harding's plea agreement.  *See United States v. Harding*, No. 05-5781 (6th Cir. July 24, 2006).  The § 2255 motion followed.  *See* DE #174.  The United States asserts, by motion, that the waiver provision also bars Harding's § 2255 petition.  *See* DE #183. Harding has responded.  *See* DE #191.  The motion for dismissal is thus ripe for decision.

The § 2255 application has been put in abeyance pending a resolution of the motion to dismiss, but the Court's recommendation necessarily also considers the merits.  *See* DE #187. Harding's waiver arguments substantially overlap his substantive claims.  For the reasons stated, the Court recommends that the District Court DENY the application for writ of habeas corpus, both because the waiver provision applies and because the claims have no substantive merit.

**I. Background**

1

Harding participated in a meth production conspiracy allegedly involving Lisa Witt, John Rodefer, and Johnny Pingleton. Kentucky authorities obtained an arrest warrant for Harding based on information provided by Pingleton. State and local police went to Harding's Rockcastle County residence on February 29, 2004 to execute the warrant. *See* DE #40 ¶ 3 (hereinafter "Plea Agreement"); *see also* DE #138 ¶ 17 (hereinafter "PSR").

Officers reportedly smelled a strong chemical odor when they arrived at the premises. Lisa Witt was at the residence and advised officers that Harding was not present, but she allowed police to search for him. As authorities surveyed the home, they noticed a trash can in a middle bedroom that contained a Mountain Dew bottle with "tubing inside" and "discarded blister pill packs." Police also observed "a straw with a residue and a piece of aluminum foil" on a bedroom dresser. *See id*.

An officer remained at the residence and secured the scene as authorities next investigated a barn approximately fifty yards from the home. Police again detected a strong odor and observed an individual exit the barn. The individual was Defendant's thirteen year old son, Timothy Wayne Harding. The younger Harding informed authorities that he had received $50 to punch out Sudafed and pseudoephedrine blister pack tablets.[1] *See id*. ¶ 18.

Authorities subsequently obtained a search warrant for Harding's residence and curtilage. In both the barn and the home, police located chemicals and equipment used to manufacture methamphetamine, including lithium batteries, Coleman fuel, anhydrous ammonia, and pseudoephedrine. Police reportedly seized over 2,660 pseudoephedrine tablets during the search.

---

[1]

Police interviewed the younger Harding again on July 5, 2004. He explained that he was in his room playing video games on February 29, 2004 when Harding entered and advised him that Pingleton wanted to speak to him. According to the younger Harding, Pingleton offered him $50 to "pop" pills out of the blister packs. The younger Harding reported receiving $50 from his father about 15 to 20 minutes after the conversation with Pingleton. *See* PSR ¶ 24.

2

In addition, police found a .22 caliber RG pistol and 300 .22 caliber brass shells in the kitchen, and recovered a .22 Marlin rifle and two 12 gauge shotguns from the bedroom. *See id.* ¶¶ 19-20, 26; *see also* Plea Agreement ¶ 3.

Witt informed authorities that she had assisted the meth conspiracy by "popping" pills out of blister packs. Police arrested Witt and filed charges in Rockcastle District Court. *See* PSR ¶ 21; *see also* Plea Agreement ¶ 3. Authorities arrested Harding at his residence on March 3, 2004 pursuant to a warrant. Police searched Harding's person at that time and found $1,620 in cash, approximately 237 milligrams of meth, lithium batteries, and a significant quantity of pseudoephedrine. *See id.*; *see also* PSR ¶ 22.

Defendant posted bond and was released from state custody on March 8, 2004, but Ohio authorities subsequently arrested Harding and Witt on or about April 5, 2004 for possessing chemicals used to manufacture meth. *See id.* ¶¶ 23, 53. Also involved in the Ohio incident were Satica Vance and John Rodefer. Law enforcement stopped the group's van after receiving information that they were shoplifting pseudoephedrine. Police found approximately 2,381 pseudoephedrine tablets, 122 lithium batteries, two gas containers, and a quantity of suspected methamphetamine in the van. The Hamilton County Crime Laboratory confirmed that the substance was 5.18 grams of a mixture containing meth. Harding also had in his possession $2,704.43 in cash and a crack pipe. *See id.* ¶¶ 23, 26; *see also* Plea Agreement ¶ 3.

Vance agreed to cooperate with authorities and provided a statement. She explained that the group was on a multi-day spree intended to acquire ingredients for meth production in Rockcastle County. Witt also spoke to police. Witt told authorities that the group had visited various stores in Indiana, Ohio, and Kentucky to obtain pseudoephedrine tablets. According to Witt, Vance

3

shoplifted most of the product.  *See* PSR ¶ 23; *see also* Plea Agreement ¶ 3.

On August 26, 2004, the grand jury for the Eastern District of Kentucky indicted Harding, Witt, and Rodefer on eight counts.  *See* DE #9.  Harding accepted a plea agreement and pled guilty on December 9, 2004.  *See* DE #40.  According to the agreement, Harding would plead guilty to count 1 of the indictment.  *See* Plea Agreement ¶ 1.  The count alleged:

> On or about a day in February 2004, the exact date unknown, and continuing through on or about April 4, 2004, in Rockcastle County, in the Eastern District of Kentucky and elsewhere, Timothy B. Harding, Lisa Witt, aka Lisa Collett, and John E. Rodefer did conspire to knowingly and intentionally manufacture fifty grams or more of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846.

*See* DE #9.

The plea agreement outlined the essential elements of the § 841 charge and the supporting factual basis.  *See* Plea Agreement ¶¶ 2-3.  Harding expressly admitted to the facts, acknowledged that the United States could prove the facts beyond a reasonable doubt, and agreed that the factual basis established the offense elements.  *See id.* ¶ 3.

Also, the plea agreement included a series of jointly recommended (*i.e.*, non-binding) Guideline calculations.  Several recommendations are at issue in Harding's § 2255 motion.  The provisions state:

> a) United States Sentencing Guidelines (U.S.S.G.), November 1, 2004, manual, will determine the Defendant's guideline range.

> b) Pursuant to U.S.S.G. § 1B1.3, the Defendant's relevant conduct includes 257.14 grams of actual methamphetamine, a schedule II controlled substance.

> c) Pursuant to U.S.S.G. § 2D1.1, the base offense level is 34.

d) Pursuant to U.S.S.G. § 2D1.1(b)(1), the base offense level is increased by two levels for the presence of firearms.

e) Pursuant to U.S.S.G. § 2D1.1(b)(6)(C), the base offense level is increased by six levels for the offense created a substantial risk of harm to the life of a minor or an incompetent.

f) Pursuant to U.S.S.G. § 3B1.4, the parties disagree as to whether the base offense level is increased by two levels for the use of a minor in the offense.[2]

g) Pursuant to U.S.S.G. § 3E1.1, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility.  If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty.

*See id.* ¶ 5.

Harding specifically agreed to have his sentence determined by the Guidelines.  Harding acknowledged that he was familiar with the Supreme Court decisions in *Blakely v. Washington* and *Apprendi v. New Jersey*, but waived all constitutional challenges to the validity of the Sentencing Guidelines.  Furthermore, Harding waived any claim to have the facts that would determine his Guideline range alleged in the indictment or found by a jury beyond a reasonable doubt.  Instead, he agreed that the District Judge could determine those facts, relevant to his Guideline range, by a preponderance of the evidence.  *See id.* ¶ 7.

The plea agreement further waived Harding's "right to appeal and the right to attack collaterally the guilty plea, conviction, and sentence[.]" *Id.* ¶ 8.  This provision is the basis for the Government's motion to dismiss.

---

[2]

The plea agreement originally recommended a two level increase under § 3B1.4, but Harding objected.  As such, the parties added language stating that "the parties disagree as to whether" § 3B1.4 would apply.  *See* Plea Agreement ¶ 5(f).

Harding agreed to cooperate with the United States.  If Harding provided substantial assistance, the Untied States pledged to file a 5K departure motion.  The substantial assistance determination, however, was "solely within the discretion of the United States." *See id.* ¶ 9.  Finally, Harding acknowledged that he had reviewed the document with counsel, understood its terms, and voluntarily entered into the agreement.  *See id.* ¶ 13.  Harding executed the agreement and then appeared before the District Court for rearraignment.

District Judge Karen Caldwell verified Harding's signature and confirmed that Defendant had reviewed the document with counsel.  *See* DE #156 at 13 (hereinafter "Rearraignment").  Harding acknowledged to the District Court that he understood the agreement's terms and conditions.  *See id.*  He told the Court that no one threatened or forced him to sign the agreement and explained that he was pleading guilty because he had in fact committed the charged offense.  *See id.* at 14.

The District Judge then reviewed specific plea agreement provisions.  Harding acknowledged that he had "carefully reviewed" the factual basis in the agreement, confirmed that the facts accurately reflected his conduct in the matter, and admitted that the United States could prove the facts because they were "true."  *See id.* at 14-15.  Harding also informed the Court that he and counsel had discussed the Sentencing Guidelines.  Defendant acknowledged that he knew the Guideline calculations in the plea agreement were "just a recommendation" and that his Guideline range would not be determined until his sentencing hearing.  *See id.* at 15-17.

The District Judge next informed Harding that his plea agreement "waived" the "right to appeal or to file a separate lawsuit attacking [the] guilty plea, conviction, and sentence."  Harding responded that he understood the provision.  *See id.* at 17.  The District Judge then discussed

Harding's obligation to cooperate with authorities. The Court advised Harding that the Government could file a departure motion if he provided substantial assistance, but that the United States had sole discretion over filing the motion. Harding again responded that he understood. *See id.* at 17-18.

District Judge Danny C. Reeves conducted the sentencing hearing.[3] The District Judge adopted the 324 to 405 month Guideline range reflected in the PSR. *See* DE #164 at 12-13 (hereinafter "Sentencing"). The PSR substantially followed the recommended Guideline calculations in Harding's plea agreement, except that the PSR applied the disputed § 3B1.4 enhancement for using a minor (*i.e.*, Harding's thirteen year old son) in the offense.[4] *See* PSR ¶¶ 31-40. Defense counsel contested the § 3B1.4 enhancement, arguing that Harding was unaware of his son's involvement. *See* Sentencing at 7. The District Court rejected Harding's contention as incredible and assessed the two-level increase. *See id.* at 11-12. In addition, the United States also refused to file a 5K departure motion. Defense counsel urged the District Court to consider an additional downward departure, but the Court declined. *See id.* at 14-18. The District Court ultimately sentenced Harding to 324 months, at the very bottom of the Guideline range. *See id.* at 22. Judge Reeves adopted the PSR's findings, except as to fine payment. *See* DE #131.

Despite waiving his appellate rights, Harding filed an appeal following sentencing. Harding

---

[3]

Judge Caldwell transferred the case to Judge Reeves prior to the sentencing. *See* DE #128.

[4]

The PSR stated that Harding's relevant conduct, per U.S.S.G. § 1B1.3 (2004), involved 257.14 grams of actual meth. Under § 2D1.1(c)(3), the drug quantity resulted in a base offense level of 34. *See id.* ¶ 31. The PSR assessed a two level increase, per § 2D1.1(b)(1), because of the presence of firearms, and a six level increase under § 2D1.1(b)(6)(C) because the offense created a substantial risk of harm to a minor. *See id.* ¶¶ 32-33. The PSR also applied the disputed § 3B1.4 two level enhancement for using a minor in the offense. *See id.* ¶ 35. After a three level reduction for acceptance of responsibility, Harding's total offense level was 41. *See id.* ¶¶ 38, 40. Finally, Harding had one criminal history point and thus fell in criminal history category I. *See id.* ¶ 45.

7

also received newly appointed counsel on direct review. *See* DE #155. The brief submitted by Harding's appellate counsel argued that Defendant's sentence was unreasonable. Harding wanted appellate counsel to challenge the § 2D1.1(b)(1) firearm enhancement, but counsel evidently refused to raise that issue. As a result, Harding filed a *pro se* supplemental brief addressing the matter. *See* DE #178-3 Exhibit B (letters to appellate counsel). The United States subsequently moved to dismiss the action based on the waiver provision. Partly because Harding never responded, the Sixth Circuit enforced the waiver and dismissed the appeal. *See United States v. Harding*, No. 05-5781 (6th Cir. July 24, 2006).

## II. Issues

The § 2255 motion/supporting memo, as amended,[5] asserts eleven claims; most contend or allege ineffective assistance of counsel.[6] The Court summarizes the arguments as follows:

1) Counsel should have objected to the amount of "actual" methamphetamine that the PSR attributed to Defendant as relevant conduct, per § 1B1.3;

2) Counsel should have argued that Harding's meth production was solely for "personal use" to reduce his relevant conduct;

3) Counsel was ineffective because the § 2D1.1(b)(1) enhancement, as described in the plea agreement, was "materially ambiguous" and should not have applied;

4) The United States breached the plea agreement by asserting that a § 3B1.4 enhancement for using a minor in the offense should apply;

---

[5] The Court permitted movant to supplement his motion and add or clarify various theories. *See* DE ##178-182.

[6] By contrast, Defendant, under oath, was "happy" with counsel and his advice at rearraignment, and he expressly thanked his counsel as part of sentencing. *See* DE Rearraignment at 10; Sentencing at 20.

> 5)     Harding unknowingly and involuntarily pled guilty because "he was unaware of the consequences or constitutional rights he would forfeit";
>
> 6-9)    Appointed appellate counsel provided ineffective assistance; and
>
> 10-11) Harding's sentence violated *Booker v. United State*s and *Blakely v. Washington*.

The United States has not yet answered on the merits, but has moved for dismissal of the case based on the collateral-attack wavier provision.  Harding responds that the waiver is invalid because of ineffective assistance of counsel.  The waiver argument by Harding basically reasserts the ineffective assistance claims from his § 2255 application and supporting memo.  Because the waiver analysis essentially converges with any potential evaluation of the merits, the Court ultimately recommends that the District Court DENY the § 2255 motion both because of the waiver provision and because the claims would fail substantively.

## III. Analysis

According to the Sixth Circuit, an "informed and voluntary" collateral-attack waiver is enforceable.  *See In re Acosta*, 480 F. 3d. 421, 422 (6th Cir. 2007); *Watson v. United States*, 165 F.3d 486, 489 (6th Cir. 1999); *see also United States v. Fleming*, 239 F.3d 761, 763-64 (6th Cir. 2001)(explaining that a defendant in a criminal case may waive any right via a plea agreement, including constitutional rights).  The record in this case supports waiver enforcement.

Here, Harding acknowledged by executing the plea agreement that he had reviewed the document with counsel and understood its terms.  *See* Plea Agreement ¶ 13.  At rearraignment, Harding again confirmed to the District Judge that he had read the plea agreement, reviewed it with counsel, and understood its provisions.  *See* Rearraignment at 13.  In addition, the District Judge

9

personally addressed Harding and specifically discussed the collateral-attack waiver, per Rule 11(b)(1)(N). *See id*. 17. Harding affirmatively responded that he understood the provision. *See id*.

The record shows that Harding's responses were voluntary and under oath, and the District Court determined at the hearing that Harding was competent. *See id*. at 8-10, 19. Solemn declarations in open court "carry a strong presumption of verity" and "constitute a formidable barrier" in subsequent collateral proceedings. *See Blackledge v. Allison*, 97 S.Ct. 1621, 1629 (1977). Considering the representations that Defendant made in the plea agreement and during rearraignment, and the significance of his sworn statements, the Court can only conclude that Harding made an "informed and voluntary" waiver. *See In re Acosta*, 480 F.3d. at 422.

In his response, Harding alleges that counsel never fully explained the plea agreement or advised him about the waiver provision, but the record plainly refutes this contention.[7] As the Court previously described, Harding acknowledged in the plea agreement and during his plea colloquy with Judge Caldwell that he had reviewed the plea agreement with counsel and understood its terms. *See*

*Blackledge*, 97 S.Ct. at 1629. The Court also notes that the District Judge took pains to stress the importance of Harding speaking truthfully at the rearraignment. *See* Rearraignment at 7.

Even if counsel did not explain the waiver, the District Judge specifically discussed the provision in open court and asked Harding whether he understood the term, in compliance with Rule

---

[7] Harding also alleges that defense counsel was "coercive" because counsel told him that he could receive a life sentence. That advice, however, was accurate. *See* 21 U.S.C. § 841(b)(1)(A)(viii). The plea agreement and the District Court also advised Harding that the maximum penalty for Count 1 was life imprisonment. *See* Plea Agreement ¶ 4; *see also* Rearraignment at 15.

11(b)(1)(N). *See* Rearraignment at 17. Harding confirmed that he understood the waiver. *See id*. As such, the plea hearing would have "cured" any deficiency by counsel. *See United States v. Boyd*, 2007 WL 900949, at *7 (N.D. Tex. Mar. 23, 2007)("The information provided to movant at the plea hearing cured any deficiency of counsel regarding the waiver provision."); *see also United States v. Murdock*, 398 F.3d 491, 498 (6th Cir. 2005)(indicating a "discussion of the appellate waiver provision in open court" satisfies Rule 11(b)(1)(N)).

Also, Harding complains that he did not appreciate the waiver's potential scope or realize that it would bar his right to assert ineffective assistance of counsel. The waiver provision, however, is unconditional, and the record confirms that Harding reviewed the plea agreement prior to acceptance. *See* Plea Agreement ¶¶ 8, 13; *see also* Rearraignment at 13. Based on the waiver's unqualified language, Harding cannot credibly contend that he underestimated the waiver's full force and effect.

The primary counterargument by Harding seeks waiver invalidation because of ineffective assistance of counsel. The allegations basically correspond to Harding's § 2255 application and supporting memo. To show ineffective assistance, Harding must prove (1) that trial counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland v. Washington*, 104 S.Ct. 2052, 2064, 2068 (1984). Because Harding's waiver argument and substantive claims overlap significantly, the Court considers Harding's submissions collectively.

For the reasons that follow, the Court finds that Harding has not satisfied *Strickland*. The Court's discussion and analysis (of ineffective assistance of counsel) follows the framework in

11

Harding's supporting memo.

*Counsel should have objected to the amount of*
*"actual" methamphetamine attributed to Harding in the PSR*

According to the PSR, Harding's "relevant conduct," under § 1B1.8, included 257.14 grams

of actual meth.  *See* PSR ¶¶ 26-27, 31.  The report explained:

> The suspected methamphetamine seized from the Harding residence on
> February 29, 2004, was submitted to the DEA for analysis and
> confirmation.  Based on laboratory analysis, the amount of marijuana [sic]
> seized was of .34 grams of actual methamphetamine.  Over 2,660
> pseudoephedrine tablets, also seized from Harding's residence in February
> 2004, were submitted to the laboratory for analysis.  Based on the
> laboratory's findings, 193.7 grams of d-pseudoephedrine HCL (actual)
> would produce 178.2 grams of actual methamphetamine, based on a 100%
> yield.  Approximately 2381 pseudoephedrine tablets, seized as a result of
> the Ohio April 2004 traffic stop, were submitted to the DEA for analysis.
> Based on the laboratory's findings, 85.47 grams of d-pseudoephedrine HCL
> (actual) would produce 78.6 grams of d-methamphetamine HCL (actual),
> based on a 100% yield.  The total amount of actual methamphetamine is
> 257.14 grams.

*Id* ¶26.

Harding complains that the PSR "does not even make sense" because it states that the

"amount of *marijuana* seized was of .34 grams of *actual methamphetamine*."  *See* DE #178-1 at 12

(hereinafter "Supporting Memo")(emphasis added); *see also* DE #191-1 at 11 (hereinafter

"Response").  In the Court's view, the reference to marijuana plainly was a typo and inadvertent

mistake.  Moreover, the .34 grams at stake would have virtually no effect on the total meth quantity

or the applicable base offense level.  *See* U.S.S.G. § 2D1.1(c)(3) (2004)(applying base offense level

of 34 if the amount of actual meth is between 150 and 499 grams).  Thus, counsel's failure to

explore the linguistic discrepancy could not have prejudiced Harding.  *See Strickland*, 104 S.Ct. at

2068.

12

Harding additionally argues that the total meth quantity is "unsupportable" because the PSR based its calculation on a "100% yield." Harding contends that a 100% yield is "impossible," but he does not allege what a reasonable yield would have been or whether that yield would have reduced his base offense level. *See* Response at 12. The plea agreement and PSR report that Defendant's relevant conduct involved 257.14 grams of actual meth, but Harding must establish, to show theoretical prejudice, that his relevant conduct was less than 150 grams to obtain a lower offense level. *See* PSR ¶¶ 26-27, 31; *see also* U.S.S.G. § 2D1.1(c)(3)-(4) (2004). Aside from arguing that the yield was too high, Harding has not approached such a showing. As such, Defendant has not demonstrated that the calculation method, and counsel's underlying performance, were deficient or prejudicial. *See Strickland*, 104 S.Ct. at 2064, 2068.

Finally, Harding emphasizes that police primarily seized pseudoephedrine tablets. As such, he argues that it was error to base his Guideline range on the amount of "actual methamphetamine" under § 2D1.1. Instead, Harding contends that § 2D1.11 should have applied because it pertains directly to the possession or distribution of pseudoephedrine. Moreover, Harding asserts that § 2D1.11 lowers his base offense level by two increments. *See* Supporting Memo at 14-18. According to the PSR, the underlying quantity of pseudoephedrine was 279.14 grams. Pursuant to § 2D1.11(d)(4), between 100 and 300 grams of pseudoephedrine corresponds to a base offense level of 32. By comparison, Harding's base offense level under § 2D1.1(c)(3), based on the alleged amount of actual meth, was 34.

Defendant, however, pled guilty to conspiracy to manufacture 50+ grams of meth, in violation of 21 U.S.C. § 841(a)(1) and § 846. *See* Judgment. Appendix A of the Sentencing Guidelines specifically lists § 2D1.1 as the applicable provision for such a § 841(a) charge.

Furthermore, § 2D1.11(c) provides:

> If the offense involved unlawfully *manufacturing* a controlled substance, or attempting to *manufacture* a controlled substance, apply § 2D1.1 . . . if the resulting offense level is greater than that determined [in § 2D1.11].

*Id*. (emphasis added).  Here, Harding himself admits that § 2D1.1 produces a higher offense level, and federal courts have held that *conspiracy* to *manufacture* meth triggers the § 2D1.11(c) cross-over provision.  *See United States v. O'Learly*, 35 F.3d 153, 154-55 (5th Cir. 1994); *see also United States v. Myers*, 993 F.2d 713, 715-16 (9th Cir. 1993).  As such, the Guidelines plainly indicate that § 2D1.1 – not § 2D1.11 – properly set Harding's offense level.[8]  Counsel's failure to pursue this argument thus was neither deficient or prejudicial.  *See Strickland*, 104 S.Ct. at 2064, 2068.

### Counsel should have argued that Harding's meth production was solely for "personal use" to reduce Harding's relevant conduct

According to Harding, "the pseudoephedrine he possessed was intended to be used in the manufacturing of methamphetamine for '**personal use**,' not resale."  *See* Supporting Memo at 20 (emphasis in original).  Based on *United States v. Kipp*, 10 F.3d 1463 (9th Cir. 1993), Harding asserts that his "relevant conduct" should not have included "any drugs used or possessed for 'personal' consumption."  *See id*. at 21.

In *Kipp*, the defendant pled guilty to possessing 117.25 grams of cocaine with intent to distribute, although he reserved the right to contest the amount of cocaine for sentencing purposes. *See id*. at 1464.  At sentencing, the defendant admitted to possessing 80 to 90 grams of cocaine, but argued that "he possessed all but five or six grams for his own personal use and that only the grams

---

[8]

In addition, § 2D1.1 properly applies in this case even though the police seized virtually no meth.  According to the application notes, "[w]here there is no drug seizure . . . the court shall *approximate* the quantity of the controlled substance."  *See* U.S.S.G. § 2D1.1 n. 12 (2004)(emphasis added).

he possessed with intent to distribute were relevant" to his Guideline calculation. *See id*. at 1465. The district court noted that it "simply cannot see how those amounts are severable" and used the full 80 to 90 grams to calculate Kipp's base offense level. *See id*. On appeal, the Ninth Circuit ruled:

> Drugs possessed for mere personal use are not relevant to the crime of possession with intent to distribute because they are not "part of the same course of conduct" or "common scheme" as drugs intended for distribution. Accordingly, we hold that in calculating the base offense level for possession with intent to distribute, the district court must make a factual finding as to the quantity of drugs possessed for distribution and cannot include any amount possessed strictly for personal use.

*Id*. at 1465-66.

Significantly, Harding pled guilty to a conspiracy to *manufacture* methamphetamine, whereas *Kipp* involved possession with intent to *distribute*. The Sixth Circuit has specifically rejected the application of *Kipp* in this context:

> Unlike *Kipp*, the defendants in this case pleaded guilty to conspiracy to manufacture methamphetamine and we find that the personal use of some of the methamphetamine they manufactured was without question "part of the same course of conduct or common scheme or plan as the offense of conviction."

*United States v. Myers*, 1999 WL 1073671, at *4 (6th Cir. Nov. 15, 1999). In view of *Myers*, and the text of the applicable statute,  Harding's argument plainly fails and provides no basis for an ineffective assistance of counsel claim.

> *Counsel was ineffective because the § 2D1.1(b)(1) enhancement, as described*
> *in the plea agreement, was "materially ambiguous" and should not have applied*

According to the plea agreement, Harding and the United States agreed to recommend a two level increase to Harding's base offense level based on "the *presence* of firearms," per § 2D1.1(b)(1).  *See* Plea Agreement ¶5(d)(emphasis added).  The Guideline provision specifically

states: "If a dangerous weapon (including a firearm) was *possessed*, increase by 2 levels."  *See* U.S.S.G. § 2D1.1(b)(1) (2004)(emphasis added).  Harding argues that the plea agreement provision was "ambiguous" and "misleading" because it used the term "presence" instead of the narrower "possessed."  *See* Supporting Memo at 26-28; *see also* DE #181 (hereinafter "Supplemental Memo").  He contends that he would have "objected" to counsel about the recommended enhancement if the plea agreement "had been worded" like the Guidelines.  *See* Supporting Memo at 27.

In addition, Harding argues that the enhancement should not have applied based on application note 3, which states:

> For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet.

U.S.S.G. § 2D1.1 n. 3 (2004).  Harding states that police found an "unloaded .22 Marlin Hunting rifle and two unloaded antique 12 gauge shotguns . . . in the closet of the master bedroom at Movant's residence."  *See* Supplemental Memo at 7.

Both the PSR and the plea agreement reflect that police found a rifle and two shotguns in Harding's master bedroom, but neither document confirms whether the firearms were unloaded and located in a closet, as Harding alleges.  *See* Plea Agreement ¶ 3; *see also* PSR ¶ 20.  More importantly, the PSR also states that police found a .22 caliber RG pistol and over 300 brass shells in Harding's kitchen.  *See id.*  Harding notably failed to mention the pistol in his pleadings.[9]  He also never specifically disputed the PSR section discussing the handgun.

---

[9]

Harding provides an evidence log reflecting the seizure of the rifle and shotguns.  *See* DE #191-2 (Evidence/Recovered Property Log).  Although the log does not reference the .22 caliber pistol, it appears that the log only relates to items found in Harding's "bedroom."  *See id.*  According to the PSR, authorities discovered the handgun in the kitchen.  *See* PSR ¶ 20.

16

In the Court's view, the uncontested facts from the PSR clearly support the § 2D1.1(b)(1) enhancement. According to the Sixth Circuit, the enhancement is proper if the United States establishes, by a preponderance of the evidence, that: "(1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *See United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996). Here, the facts show that Harding had constructive possession of all the firearms because police found the weapons at Harding's residence. *See id.* ("Constructive possession of an item is the ownership or dominion or control over the item itself, or dominion over the premises where the item is located.")(quotations omitted).

The record also shows that the possession of the firearms would have been "during the commission of the offense." *See id.* The PSR indicates that Harding used his residence, particularly the kitchen area where police found the pistol, and maybe even the master bedroom, to further the meth production conspiracy. *See* PSR ¶ 20 ("Specifically, in the kitchen area, officers found clear plastic bags with a suspected methamphetamine residue, a bottle equipped with a hose which was activating, two containers from under the sink which contained methamphetamine oil, a .22 caliber RG pistol, and just over 300 .22 caliber brass shells."); *see also id.* ("In the master bedroom, officers found $4,350 in cash located in a safe under the bed [and] numerous cola bottles with plastic tubing[.]"). In addition, the police seized the firearms sometime "during the period of the conspiracy." *See United States v. Moses*, 289 F.3d 847, 850 (6th Cir. 2002); *United States v. Bolka*, 355 F.3d 909, 912 (6th Cir. 2004); *see also* Indictment Count 1 (alleging that Harding conspired to manufacture meth from "[o]n or about a day in February 2004, the exact date unknown, and continuing through on or about April 4, 2004"); Plea Agreement ¶ 3 & PSR ¶ 17 (both noting that the search and seizure occurred on February 29, 2004). Based on these facts, Sixth Circuit authority

17

confirms that Harding possessed the weapons during the offense.  *See Moses*, 289 F.3d at 850

(finding the defendant possessed guns "during his offense" because he "acknowledged . . . that he

kept firearms in his house during the period of the conspiracy" and "further admitted that he used

his house to perform acts in furtherance of the conspiracy").

According to *Hill*, "[o]nce it is established that a defendant was in possession of a weapon

during the commission of an offense, a presumption arises that such possession was connected to

the offense."  *See Hill*, 79 F.3d at 1485.  As such, the burden would have shifted to Harding to show

that "it is *clearly improbable* that the weapon was connected to the offense."  *See id.* (citing §

2D1.1(b)(1) n. 3)(emphasis added).  Factors that the Sixth Circuit may consider in evaluating a

weapons's relationship to a particular drug offense include: the proximity of the firearm to the drugs;

the type of weapon involved; whether the firearm was loaded; and any alternative purpose to explain

the weapon's presence.  *See Moses*, 289 F.3d at 850.

In this case, Harding asserts that the two shotguns are antiques that he received years before

the conspiracy.  *See* Supplemental Memo at 8.  He also explains that his son purchased the rifle

"over two years prior to the offense" for "hunting and recreational purposes."  *See id.*  Furthermore,

Harding alleges that police found the "three hunting guns . . . unloaded, in a master bedroom closet,

while the suspected Meth lab was found in a barn over 100 yards from the residence."  *See id.* at 10;

*see also United States v. Zimmer*, 14 F.3d 286, 290-91 (6th Cir. 1994)(rejecting § 2D1.1(b)(6)

enhancement because the defendant showed that three rifles found on his premises were for hunting;

no weapons were found near controlled substances; and the charged offense was for manufacturing

marijuana – not trafficking).

Even if the application note could disqualify the rifle and shotguns, Harding never addresses

whether an enhancement is proper based on the handgun.[10]  Unlike the "hunting guns," a .22 caliber pistol is a type of firearm "typically used" in drug offenses.  *See Moses*, 289 F.3d at 851. Furthermore, even though the primary meth lab may have been in the barn next to Defendant's residence, police discovered the pistol in Harding's kitchen where authorities also found substantial meth-related equipment and by-products.  *See* PSR ¶ 20.  In addition, police found the weapon next to a stockpile of ammunition (although the record does not indicate whether the firearm was actually loaded).  *See id.*  Finally, because Harding never mentioned the pistol in any of his pleadings, he provides no alternative explanation for the weapon's presence in the kitchen.  *See Moses*, 289 F.3d at 850-51.

On this record, the factors clearly indicate that Harding could not have rebutted the presumption that § 2D1.1(b)(1) applied, at least as to the handgun.  Harding plainly failed to show that it is "*clearly improbable*" that the .22 caliber pistol "was connected to the offense."  *See Hill*, 79 F.3d at 1485 (citing § 2D1.1(b)(1) n. 3)(emphasis added).  As a result, the Court finds that the enhancement was proper.  Furthermore, because Harding has not refuted whether the enhancement applies, the Court also rejects his contention that he would have "objected" to the provision if the plea agreement "had been worded" like the Guidelines.  For these reasons, defense counsel also could not have prejudiced Harding by failing to contest the enhancement, or by not explaining the textual discrepancy between the plea agreement and the actual Guideline provision.  *See Strickland*, 104 S.Ct. at 2068.

* * *

Plainly, Harding has not shown that counsel's representation during plea negotiations or

---

[10]

Notably, § 2D1.1(b)(1) applies to a **singular** firearm.

sentencing was deficient and/or prejudicial. *See Strickland*, 104 S.Ct. at 2064, 2068. The ineffective assistance claims, therefore, substantively fail. *See id*. Harding's waiver avoidance argument, focused mainly on ineffective assistance, also fails.

The Court next considers whether the waiver would have become ineffective because the United States allegedly breached the plea agreement. Harding asserted this claim in his § 2255 application and supporting memo, but did not discuss it in his response to the motion to dismiss. The claim may have relevancy in the waiver context, however. The Sixth Circuit has recognized that a "material breach of a plea agreement" by the United States "renders" a waiver provision contained in the agreement "ineffective." *See United States v. Ramsey*, 177 F.App'x 464, 465 (6th Cir. 2006)(citing *United States v. Swanberg*, 370 F.3d 622, 626-29 (6th Cir. 2004)).

According to Harding, the United States allegedly violated the plea agreement during sentencing by arguing that § 3B1.4 should apply. The Guideline provision allows a two level enhancement for offenses involving a minor, in this case Harding's thirteen year old son. Harding's plea agreement recommended the enhancement originally, but Harding objected. As a result, defense counsel and the United States inserted language stating that "the parties disagree as to whether" § 3B1.4 applies. *See* Plea Agreement ¶ 5(f).

The provision, as amended, clearly did not prohibit the Government from arguing for the enhancement. In fact, it reflected that the United States viewed the section as applicable.[11] Furthermore, Harding could not have been misled because counsel communicated to Harding the precise language that had been added to the plea agreement term. *See* DE #191-2 at 2 (hereinafter

---

[11]

Defense counsel Cox, at rearraignment, highlighted the issue and acknowledged that the parties had "agreed to disagree." *See* Rearraignment at 21. Plainly, no promise from the United States existed.

"Harding Declaration")("He left to speak to the prosecutor concerning the enhancement. When he returned, he showed me writing above the enhancement that stated 'the parties disagree as to whether' along with his and the prosecutor's initials.").  The breach claim clearly has no merit and no impact on waiver effectiveness.[12]

The final waiver issue is its scope.  Based on its wording, the waiver theoretically bars every claim alleged by Harding because the provision has no conditions or qualifications. Sixth Circuit authority, however, has shown that waivers do not always apply categorically.  *See Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006)("[S]ubject matter jurisdiction is not subject to waiver."); *In re Acosta*, 480 F.3d at 422 n.2 ("[C]laims that a guilty plea was not knowing and voluntary, or was the product of ineffective assistance of counsel . . . generally cannot be waived . . . ."); *United States v. Caruthers*, 458 F.3d 459, 472 (6th Cir. 2006)("[A]n appellate waiver does not preclude an appeal asserting that the statutory-maximum sentence has been exceeded.").

Harding alleges that he unknowingly and involuntarily pled guilty because he did not fully understand the "consequences or constitutional rights he would forfeit."  *See* Supporting Memo at 32.  In essence, Harding asserts plea invalidity because he could not have anticipated counsel's ineffectiveness at sentencing when he accepted the plea agreement and pled guilty.  *In re Acosta* may prohibit waiver enforcement regarding this claim because it implicates the validity of the guilty

---

[12]

After the parties amended the plea agreement provision, Harding also alleges that counsel told him that the "enhancement would be dropped."  *See* Harding Declaration at 2.  The actual language that the parties inserted, however, does not suggest that the United States would "drop" the enhancement.  Furthermore, the District Judge advised Harding during the plea colloquy that the Guideline provisions in the plea agreement were "just a recommendation," and that the District Court would determine Harding's Guideline range at sentencing – a range that could have exceeded the recommended Guideline calculations.  Based on the amended language and the plea colloquy, the Court summarily rejects Harding's further contention that he believed that the "enhancement would be dropped."

plea.[13]  The claim surely fails on the merits; the Court's waiver analysis already evaluated counsel's performance at sentencing and during plea negotiations and found no ineffective assistance.

Similarly, Harding complains that counsel "induce[d]" him to accept a plea agreement that "waives every imaginable appellate right." *See id*. at 33-34.  The mere fact that Harding waived his appellate rights, however, does not establish that counsel was ineffective. *See United States v. Leyva*, 2002 WL 31056694, at *2 (N.D. Ill. Sept. 13, 2002).  As has been noted, the Sixth Circuit readily enforces such waivers, provided the defendant waives knowingly and voluntarily. *See In re Acosta*, 480 F. 3d. at 422.  The record in this case establishes an informed and voluntary waiver. *See id*.  The Sixth Circuit applied and enforced the waiver on direct appeal. *See United States v. Harding*, No. 05-5781 (6th Cir. July 24, 2006).  Furthermore, Harding identifies no colorable issues for appeal.  Rather, the United States dismissed seven counts and Harding received a sentence at the bottom of the Guideline range due to the plea agreement and his acceptance credit.  Based on this record, Harding has not shown that he was prejudiced by the waiver or that counsel performed ineffectively. *See Leyva*, 2002 WL 31056694, at *2; *see also Strickland*, 104 S.Ct. at 2064, 2068.

The last two claims (and the only two claims not yet discussed) assert ineffective assistance of appellate counsel and violation of *Booker v. United States* and *Blakely v. Washington*.  Both claims have been waived.[14]  The Court also alternatively finds that the arguments have no merit.

---

[13]

According to *In re Acosta*, waiver enforcement could conceivably apply to claims alleging plea/waiver invalidity if such claims are patently baseless.  *See In re Acosta*, 480 F.3d at 422 (indicating that waiver enforcement is proper if "the defendant *did not articulate a basis* for attacking the validity of his plea.")(emphasis added).

[14]

The ineffective assistance of appellate counsel claim does not fit any exception from waiver enforcement.  Moreover, Harding expressly "agree[d] to have his sentence determined pursuant to the Sentencing Guidelines" and validly waived his appeal/collateral-attack rights.  *See* Plea

According to Harding, appellate counsel failed to raise meritorious issues and did not respond when the United States moved to dismiss the appeal.  Moreover, counsel never alerted Harding when the Sixth Circuit granted dismissal, which he claims  "prevented" him from filing a timely petition for certiorari with the Supreme Court.  *See* Supporting Memo at 34-37.  The *Strickland* standard applies to appellate representation.  *See Abdurrahman v. Henderson*, 897 F.2d 71, 74 (2nd Cir. 1990); *Miller v. Keeney*, 882 F.2d 1428, 1433-34 (9th Cir. 1989); *see also Wyley v. United States*, 1997 WL 49073, at *1 (6th Cir. Feb. 3, 1997).

In this case, Harding has not shown prejudice, *i.e.*, that the result of the appeal would have been different if counsel had raised other arguments or responded to the dismissal motion.  *See Strickland*, 104 S.Ct. at 2068.  First, Harding fails to show that the Sixth Circuit would have invalidated the waiver and considered the appeal.  Second, even if the Sixth Circuit permitted review, Harding identifies no valid issues for appeal.  Last, any further review by the Supreme Court would have been *discretionary* with that Court.  Based on the arguments presented, Harding has not demonstrated that there is a reasonable probability that the Supreme Court would have granted review, or that Defendant would have prevailed if review had been granted.  *See, e.g., Palacios v. Thompson*, 1999 WL 1040088, at *2 (9th Cir. Nov. 16, 1999).  Thus, Harding has not established a valid ineffective assistance claim based on appellate counsel's representation.  *See Strickland*, 104 S.Ct. at 2068.

The final *Booker/Blakely* claim also fails substantively.  The plea agreement provided the basis for the District Court's sentence, consistent with the statutory range.  Judge Reeves properly

---

Agreement ¶¶ 7-8.  The Sixth Circuit indicates that this combination of waiver provisions would foreclose any potential *Booker* review.  *See United States v. Puckett*, 422 F.3d 340, 343 (6th Cir. 2005).

found sentencing facts by a preponderance of the evidence, and his sentence reflected awareness that *Booker* rendered the Guidelines nonmandatory.  *See* Sentencing at 21.   Thus, even if reviewed, the sentence would be appropriate under *Booker.  See United States v. Hill*, 231 F.App'x 452, 453 (6th Cir. 2007)(noting that "*Booker* did not eliminate judicial fact-finding" and that the district court properly finds facts, by a preponderance, and then determines sentence in light of statutory factors).

In sum, the Court rejects Movant's application for § 2255 relief.  The Court finds that the waiver provision is valid.  Moreover, the Court also finds that the asserted claims have no legal merit.  As such, Harding has not shown an error having a "substantial and injurious effect or influence on the proceedings," or a "fundamental defect which inherently results in a complete miscarriage of justice, or an error so egregious that it amounts to a violation of due process."  *See Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999).  Harding's § 2255 motion therefore fails under the applicable standards.

## IV.  Evidentiary Hearing

Harding's application requests an evidentiary hearing.  On this record, the Court finds that such relief is unnecessary.  The reviewing court need not conduct a hearing if the allegations in the petition are inherently incredible, refuted by the record, or conclusory.  *See Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999); *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996).  Here, the waiver provision applies.  In addition, the claims asserted have no support in law.  *See Blanton*, 94 F.3d at 235.  For both of these reasons, the Court finds that this matter merits no additional evidentiary development by way of a hearing.

## V.  Certificate of Appealability

A Certificate of Appealability may issue where the petitioner has made a "substantial

showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). This requires the movant to demonstrate that "jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 120 S.Ct. 1595, 1604 (2000). The reviewing court must indicate which specific issues satisfy the "substantial showing" requirement. *See* 28 U.S.C. § 2253(c)(3); *see also Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001)(requiring an "individualized determination of each claim" in considering whether to grant a certificate of appealability).

Because the waiver provision applies, and because Movant's arguments also fail as a legal matter, Harding's petition does not meet the § 2253 threshold. The Court's determination, as to both the waiver and the merits, is not debatable in this case. Harding has not made a "substantial showing" as to any claimed denial of right, as shown by clear precedent applied to the dispositive facts. Therefore, the Court recommends that, in the § 2253 context, the District Court refuse to certify any issues for appeal.

## VI. Recommendation

For all of the reasons stated in this decision, the Court **RECOMMENDS** that:

1) the District Court DENY, with prejudice, Harding's § 2255 motion, *see* DE #174; and

2) should Harding make a motion under 28 U.S.C. § 2253, the District Court refuse a Certificate of Appealability as to all issues.

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of said statute. As defined by § 636(b)(1), Fed. R.

Civ. P. 72(b), Fed. R. Crim. P. 59(b),  and local rule, within ten days after being served with a copy

of this recommended decision, any party may serve and file specific written objections to any or all

portions for consideration, de novo, by the District Court.

This the 24th day of June, 2008.

Signed By:

*Robert E. Wier*

United States Magistrate Judge